Next case is United States v. Osborn, 18-4009. Good morning. Amy Clear on behalf of Appellant Jen Osborn. Counsel, please pull the microphone. Thank you. Thank you, Your Honor. We are here today because the government is attempting to forcibly inject Appellant Jen Osborn with antipsychotics purely to attempt to bring her to competency to stand trial. Yet even if it were possible to bring Ms. Osborn to competency, which we contest, and even if it were possible to convict Ms. Osborn with the help of competency with those specific drugs which we contest, the government's interest in prosecuting Ms. Osborn specifically in this particular case where Ms. Osborn's guideline range is zero to six months, and today she is served three years and seven months, in this particular case renders the government's interest not important. For that reason, I can address each of the cell factors for the court. Well, focusing on that one point that you raised, I mean, the district court focused on the statutory maximum, right, in determining the government's interest. It did. Why is that not appropriate? The government, the court can look at the statutory maximum. This court looked at cell, and the first case that this court looked at following cell, and cell was a pre-Booker case, meaning it came down when the guidelines were mandatory. And in Bradley, this court took cell's language, which was that there are two circumstances when a court can look to whether the government's important interest is no longer important, and one of those is when a defendant has been confined to an extent of time that they will be credited for the amount of time that they've served, meaning under 3583D, they'll get credit for that time. When the Supreme Court said that, because the guidelines were mandatory, the logical inference is guideline time. This court in Bradley said, to us, that means that the expected sentence, or the sentence is in parity with what we expect the sentence to be. I'm looking at Bradley, and so what do you infer from that? I mean, the guidelines aren't mandatory anymore, so. So, if the expected sentence for any court, you look at the statutory maximum, the expected sentence for a defendant is what that district court expects the sentence to be. If a defendant coming before a court is a criminal history 6, like in Valdesuena-Puentes, with multiple convictions, 8 to 10 convictions, the district court looks at that and says, eh, this is a problem. I'm not going to give that person a guideline sentence, because this court in Crystal expects that the guideline sentence is a rebuttable presumption of reasonableness. Well, how precise are you expecting? I mean, we have to fashion a standard that's not only going to govern in this case, but other cases. I mean, how precise does the court have to be in this analysis? Because sometimes cases are complicated. You don't even know until after the pre-Senate report. You don't know until after the parties argue what really could be a viable expected sentence. I mean, so are you talking about just roughly general ballpark, based upon looking at the guidelines and looking at the statutory maximum, or are you talking about something else? Well, I think CEL directs, because of the importance of this type of case, CEL commands that the courts look very specifically at the defendant. And then – And there's nothing in CEL that's going to speak directly to this issue. And if there is, please point it out to me. Because CEL speaks in general terms. I looked at it just this morning, I think, or last night. And so what in it is – Well, I'm sorry. Please. In Valles-Fuentes, the court looked very specifically at the guidelines and estimated two ranges, actually, for that particular defendant, and said it would be – and excuse me that I don't know the exact ranges, but it determined that it was going to be between 77 to 96 months or between six to eight years for that particular defendant, depending on what the range was. So the court is very specific on what the range was going to be for that defendant. And has it done that? Have we done that in every case, or is that a case driven by that particular case? And even then, those were two guideline ranges. Correct. I mean, if the court gets it wrong, is the defendant going to have some ground of prejudice, that, oh, you didn't calculate, you know, you didn't give me my offense-level criterion?  You don't know. Oh, absolutely, Your Honor. And as a federal defender, we are going to dispute, and there's going to be ups and downs. Well, that's the point. Absolutely. Well, if that's the rule you're asking for, I don't know how viable that is, because no district judge is going to want to walk into error by having to calculate to the exact percentage point what you're going to get as an expected sentence. And I think that's why Bradley said expected sentence, not the absolute accurate sentence. But when we're talking when her range is zero to six months, and the – At most, it was 18 to 24, right? Right. That was what you said the first time. Right. Because I didn't know – Which even your briefing suggests that this is imprecise science, right? Correct. Because I was giving the complete benefit of the doubt. Let's assume she was a six, because I didn't have the information at the time. I didn't have the information. I didn't want to quibble. I was saying, let's assume worst-case scenario. But for it to be zero to six months, now she's seven times that. Well, even worst-case scenario, she's been in longer than 24 months, right? Correct. Okay. Correct. And that's my problem, is when this Court has interpreted cell to mean this is one of those special circumstances that the district court did not properly account for. It did not say anything that would have indicated that she was such a recidivist, or such a serious case, or that this was such a serious case, that I expected I was going to sentence her to something seven times or eight times the guideline range. That's not compliant with this Court's case law. And it also, I think, neglected cell's requirement to consider the special circumstance of civil commitment, which cell specifically spoke to. Ms. Osborne's been civilly committed three times, one time for eight years. For the government to argue she was a danger in Utah State facilities, she's not a danger for civil commitment, I don't know what the future holds for Ms. Osborne, but for the government to argue out of both sides of its mouth, merely to get the court below to find that she's not a danger for purposes of involuntarily medicating her here, I don't understand the point anymore of this litigation on the government's part to attempt to try to forcibly medicate her to stand trial. Cell says this is supposed to be rare. This is not what cell was for. What do you understand the government's argument to be on civil commitment now? The government admits that when Ms. Osborne was forcibly medicated when she was in the Utah State or the county jail while she was awaiting this Court's decision the first time around, that they forcibly medicated her because the jail facility thought she was a danger. The government admits in its briefing that that wasn't true. Apparently it was just that the state jailers didn't know what to do with someone who made verbal threats of that caliber. The government is now saying civil commitment, that was like a Harper proceeding, a dangerous proceeding. The government is stating in its brief now that civil commitment is not, she's not a candidate for civil commitment because she's not really a danger that the state authorities overreacted practically with their Harper, which forcibly injected her under the Harper. So she either is a danger or she isn't a danger, depending on what government wants to argue on a given day. The point is Ms. Osborne is being penalized and imprisoned because she's mentally ill and that's not what we should be doing with the people in our country. Can I turn to the second cell factor? Unless you have questions on the first. I'll stay with the first all day long if you'd like. Dr. Silvas is suggesting that Ms. Osborne can be medicated and that the medications that he's suggesting for her will significantly further the government's interest in bringing her to competency. Dr. Silvas did not look at anything other than a 2014 record regarding this federal case in making those very serious decisions about Ms. Osborne. There is not a single medical practitioner in this country who would make these type of very serious decisions about someone's medical, about injecting these types of drugs into someone without taking a peek at their medical records, about looking at their heart rates, about putting a stethoscope to them. And why couldn't he do that after the order had been entered and determining at any given occasion whether she was a candidate to go forward? I mean, that's part of the order, right? That if it shows that it's contraindicated, then we stop. Because he sold the district court on the idea that he was going to push Risperdal and then told the district court that even if it turned out that after doing some testing that she wasn't a candidate, that his plan was going to stay the same. I thought there was a backup plan. I thought there were at least three. My understanding is there were three drugs, and if they didn't work, they'd go to plan B. Haldol and prolixirate. I'm sorry if I'm mispronouncing. God knows I won't know how to pronounce it, so we're in the same boat. Go ahead. But with Risperdal, he sold that as the least side effects with that drug. But then he also said he's not going to do any testing until he gets the authorization. But if that testing shows that Risperdal isn't the best drug, he's going to move to the others. But why is he not doing that testing first? Could he have tested her first without at first having the cell hearing? Absolutely. He can go without her consent. She hasn't consented to anything. He's supposed to be able to go basically whenever he wants and do a bunch of tests on her to determine whether these are going to be appropriate drugs. I mean, doesn't it have to come afterwards? He can examine her. He can take her blood pressure if she's willing. But at the very least, can you look at the records from her? He had availability. He refused even looking at the records. He refused to even see that Haldol and Risperdal and prolixirate had been used on her dozens of times, and she was delusional after each time. Now, the government would like to say that's successful. I don't call that successful. So the fact that he's refusing to look at records and wants to use those as a means to try and do it again, to try and make her competent, that's not going to get them anywhere other than to forcibly inject Ms. Osborne yet again to no end. Were you counsel at the cell hearing? I was not. Okay. And I think I may have missed it. Your answer to Judge Carson's question about whether they could have tested her prior to the cell hearing, you said examine. But if she's not willing to be involuntarily medicated, why does she have to agree to be tested? And I agree. In retrospect, I agree with that. But when you have someone like Ms. Osborne who comes with this history. Well, then, let me see that. And I want to know what the scope is on your notion that they should look at records. I mean, Ms. Osborne has been having problems for a long time. She probably has a file like that. 22,000 pages. Yes, 22,000. I didn't remember the exact number, but I knew it was something like that. And so are you saying he needs to go through every one of those records before he can make any sort of opinion, especially given the fact he's been doing this for a while? I would think that a physician would like to know the bare minimum. Well, you would think. But, I mean, he, as a physician, said, I don't need to do that. I know what to do. I, as a non-physician, was able to at least go through Dr. Johnson's record. And I presented it to the court in a one-and-a-half page summary. And I provided you very quickly the drugs that she's been on and very quickly the result that I was able to call from Dr. Johnson. I'm sorry. No, please. Did anyone offer that to the doctor in this case? A summary or her counsel say, hey, here's a summary for you to consider, or a doctor, since you don't want to review all these records or examine her? Actually, Dr. Hamilton made reference to it in her report. And that's the doctor that Dr. Silvas apparently relied on. Dr. Hamilton made reference to it in one sentence and said, please refer to Dr. Johnson's report. So it was readily available through his own psychologist that he referred on. He just chose not to. Okay. So the issue of whether he should have examined her is sort of illusory then. I mean, because he did have information that would have provided the same thing that you contend he would have found if he had done a preliminary examination. Correct. But he said that his treatment plan would not change regardless. And so he didn't look at it. But at a certain point, didn't he say it would be helpful if I knew what her prior formulary history was on these drugs, but he just didn't do it? He didn't do it. And correct, he was very contradictory. He said it would be helpful, I didn't do it, wouldn't change even if I did. That's what I read. Your time is up. Thank you. Good morning, Your Honors. Good morning. Simone Case Hargrove for the United States. May it please the Court. I would like to draw the Court's attention first to Volume 2 at page 50, which is Dr. Silva's report. In Dr. Silva's report, which was created approximately six months before he testified in September, he explained that he had reviewed Dr. Hamilton's report. Dr. Hamilton's report, in turn, reviewed extensively Ms. Osborne's history and the 22,000 pages of medical records. She explained that she, too, had reviewed Dr. Johnson's very detailed report, which we included for this Court in our supplement. And she noted that Dr. Johnson's report was very correct and incorporated it in. Dr. Silva's explained that he reviewed Dr. Hamilton's report, and he noted that the review of history indicates a history of psychiatric hospitalization dating back to 1982. I thought Dr. Silva testified that it would be helpful if I knew her reactions to the formulary drugs that are in question. But he didn't know it. So, I mean, if he did this review that you're talking about, he obviously took nothing from it, did he? I disagree, Your Honor. Is that what he testified? Your Honor, she testified, and she was very careful in the brief of making this clear, that he did not review the records. And that's correct. Apparently, he did not review the 22,000 pages of medical records. Well, did he? Well, that's not my question. My question was, he testified, as I understood it, it would be helpful if, and I think that was the exact word, it would be helpful if I knew what her reaction was to these formulary drugs. But I do not know what it is, and I don't need to know. That's correct, Your Honor. Well, then, so whatever purpose the review had, it obviously didn't stick, did it? Your Honor, the point, however, the point I'm trying to make here is that he made his recommendations, and he conducted his evaluation and did his detailed report six months before he testified. He seems to have been very ill-prepared for his testimony. He did not recall a number of things. Well, recall, the question, yes. Okay. That's fine. He's ill-prepared for his testimony. But what is going to be the basis for the district court's decision in the Sell hearing? Isn't it supposed to rely upon what he said under oath in that hearing? Your Honor, the court certainly may rely upon that. It may also rely, however, upon the written report that was submitted as part of the record, and is indeed part of the record today. But it was your – I'm sorry. No, please. But it was your burden to prove these factors by clear and convincing evidence below, right? Absolutely. And you have a physician that you're relying on who, by your own admission, was forgetting a lot of things, perhaps not making a clear record for the district court to rely on. Your Honor, reviewing Dr. Silva's testimony is somewhat painful. He is a very, very precise individual. He refused, for example, to note that Ms. Osborne was obese because he has a very specific definition. He explained that it was not his job to review the actual medical records, but that he had discussed things with Dr. Hamilton. He recalled asking Dr. Hamilton what drugs had been prescribed to Ms. Osborne previously, but he could not recall what Dr. Hamilton's answer was. That's at volume three at page 187. But at the time that he made his recommendations and concurred with the diagnosis, he very clearly had Dr. Hamilton's report on his mind. He detailed from that report and explained that the diagnosis was consistent with the history and with all of the observations of Ms. Osborne at Carswell. Was the report admitted into evidence? Yes, it was, Your Honor. Was there an objection to it? No. No, I don't believe there was to Dr. Silva's report. There was to Dr. Cherry's report. Dr. Cherry was another psychiatrist. She also concurred with Dr. Silva's and Dr. Hamilton's reports, and she, too, reviewed all of the evidence at the administrative hearing at the prison. Was her report ultimately admitted? Yes, Your Honor. Even though there was an objection? Yes, Your Honor, it was. Okay. It was. And Dr. Cherry's report is also in the record. I believe that's in volume two as well. And when you say that the court had available to it both the report and the recommendation, they had available to it prior to the hearing the recommendation of Dr. Silva, right? Yes, Your Honor. Well, a hearing has to have some purpose, right? It gives the court an opportunity to test the bases of the recommendation and to have that individual under oath talking about the recommendation, right? Correct, Your Honor. Okay. Well, then, based upon that, if it's painful to read his testimony and his testimony does not give you any basis, well, I'm not saying you, I'm saying just generally, would not give one any basis for confidence that this individual made this recommendation with an internally consistent basis for understanding of what this person's situation is, well, what do you do with that? I mean, they made a recommendation in a report, but as the court is sitting there, the district court is hearing somebody making these conflicting remarks, well, it would be helpful if I knew what her formulary thing was. So he didn't say as a matter of science it wasn't helpful. He just said it may be helpful, but I didn't look at it and it wouldn't change anything anyway. I mean, what do you do with that? Your Honor, he said it would be helpful. What do you do with it clear and convincingly? Your Honor, you look at the entire record. The entire record includes those reports. And those reports were made contemporaneous to the review of the other reports, Dr. Hamilton's report and Dr. Johnson's report, that very clearly do go into all of those details. And he did recall asking Dr. Hamilton about the previous medications prescribed. He just, again, at the hearing could not recall what had been prescribed. He also, though, explained, I mean, in terms of looking at the hearing as well, at hearing testimony as well, he explained that nothing the defense counsel was suggesting would change his opinion in terms of different medications. The medications he was recommending. It gives you a great deal of confidence when, in that moment in time, he doesn't have any real recollection of what it was. I mean, when somebody says to you, no matter what you tell me, it's not going to change my mind, is that a persuasive way to respond to something? Your Honor, generally I would say no. However, in this circumstance, Risperdal is a second generation antipsychotic. Antipsychotics are absolutely the medical standard for a patient with symptoms like Ms. Osborne's. He explained in great detail why it was preferable to Halidal or Haldol, which is the commercial name, and to Prolixin because it was a second generation. He explained that he will carefully monitor, meticulously monitor, any potential side effect. He explained that the potential side effects that defense counsel were raising as potential problems would be ones that he would be monitoring for and managing, and that if he could not manage them, he would take the patient off that medication and try something different. So he really did address a lot of the concerns that Your Honor is raising. However, I can only concede that his testimony was not ideal. He did not recall and he clearly had not reviewed everything he had reviewed at the time he wrote his very detailed report. Nonetheless, that report is so detailed and it does refer so clearly to Dr. Hamilton's report and to the history that I believe the Court can be confident, based on the record as a whole, that he did review Dr. Hamilton's report. And knowing Dr. Silvis and reading his entire testimony, he also, it's true, acknowledged he had not reviewed the actual medical records. But that's all he was acknowledging, Your Honor. Now, given all of this difficulty that we've been talking and you've been responding to in regards to that, then let me take you to the reason for proceeding with the prosecution of this lady and the argument that opposing counsel was making that, look, you're going to do all this and the trial court could just give her six months if found guilty. In essence, that's kind of what I'm paraphrasing her argument. But doesn't that just seem to beg the question of, with everything you've said about how hard it is and why it should be done and why we should take this as clear and convincing and weigh that against the probability that this is really going to serve some type of justice in this matter? Your Honor, the government still has a strong interest in prosecution in this case. But you may have a strong interest. But tell me what that strong interest is in light of the possible punishments in regards to this matter. Absolutely, Your Honor. And what you're going through just to be able to get her medicated. Absolutely, Your Honor. In addition to a period of custodial confinement, Ms. Osborne will also be subject to supervised release. And with a Class C felony like the one with which she's charged with a 10-year statutory maximum, supervised release will be three years long, can be as long as three years. Even if the court decided that she had served all of her custodial term and that that should be granted as time served, the government has a very strong interest in having Federal resources supervising Ms. Osborne as she returns to the State system, which is what the Federal statutes require, returns to the State system and gets evaluated again  Are you convinced she's going to violate? Your Honor, I'm not convinced she's going to violate. I am convinced, I am very convinced that it will be extremely helpful and extremely helpful to the victim in this case to know that there is a layer of Federal supervision on top of the safety net provided by the State of Utah. The State of Utah has done a remarkable job. For her to know. Pardon? It's important for her to know. And yet right now you're arguing she doesn't know or the argument is she doesn't know or doesn't understand because she needs to be medicated. Oh, sorry, Your Honor. It's important for Judge Campbell to know. Judge Campbell is the object of the threat. So the government's interest in vindicating the rights of the victim and in protecting society come into play here. They do, but it becomes proportional. I mean, if you are looking at six months, how long has she been locked up now? I mean, we're talking about a period of confinement that dwarfs anything she possibly could get. And note that the, well, I want to get to a specific point, but let's assume we're working with the guidelines. The guidelines, although I definitely think threats on Federal judges are a big deal, but I mean the guidelines have an expected range which really is not that high. And so the bottom line is that, granted, the court could vary, all of that, but the point is that you start from a point that is a low baseline. And if she's going to be incarcerated, we have to reach a decision here. Let's assume that you win. She gets prosecuted. It could be two years before she ever sees the inside of any jail or is put on supervised release. Well, let's just immediately put her on supervised release because she's done time served. Is that, I mean, how does that make sense? Your Honor, we do not see this as a guidelines case. And it's true that Judge Johnson did not make a specific finding about whether he saw this as a guidelines case. But based on his discussion of the seriousness of her behavior and the real danger that is presented here, I don't believe he sees this as a guidelines case. Well, you bled exactly into my second question, which is this. It's not clear on the record whether he considered the guidelines at all. In other words, it appears on the record that he looked at the statutory maxim as being the touchstone, the definite article, touchstone for how to do this. Does our case law support that? I mean, we speak of expected sentence. An expected sentence is not just a statutory max unless the court were to articulate on the record exactly what you said, that, you know, I've looked at the guidelines. I'll tell you the guidelines aren't going to do it for me on a case involving somebody threatening a federal judge, blah, blah, blah. None of that is there. What it appears to be is the court is saying I'm looking at the statutory max full stop. Now, if it did that, is that consistent with our case law? Your Honor, it is consistent with the case law. Okay. How's that? Which cases are you referring to where it is consistent? Your Honor, SELL looks in very general terms and requires the court to consider the facts of the individual case, which it certainly did here. The Tenth Circuit case law in Bradley, the court appears only to have considered the max. The court used the phrase expected sentence in parity with the expected sentence. Whatever was the expected sentence in Bradley, where the, as I understand it, you had mandatory guidelines, but the expected sentence in a case where you have advisory guidelines and where you, which granted are advisory, but the point is it's not evident in any criminal case that the statutory max is going to be the expected sentence unless the court articulates it on the record that it is, right? Yes, Your Honor, but what's interesting in Bradley is that the court referred to 50 years. And it's confusing, and I pondered it at some length, because Bradley lists in a footnote early on in the case four different charges. But then later in the case it refers to three charges being relevant. So I played addition with those charges and with the maximum on them, and there are three that add up to 50 years. There's no way you can get to 50 years in Bradley from the guidelines, even considering what Your Honor has noted about the mandatory nature of some of those guidelines. That's why I say that Bradley indeed considered the statutory maximum. Archuleta, which is what the district court relied on, is an unpublished decision, but that is precisely how the three-judge panel in Archuleta interpreted Bradley. Would it be better, would it be preferable to the government if the court had done precisely what the court did in Archuleta and covered all possible bases? Yes, Your Honor, that would be wonderful. But the district court did not err. Furthermore, the district court. So the principal case you're relying upon to indicate that the district court did not err, and I'm talking about our controlling authority, the principal case you're relying upon is Bradley then? Yes, Your Honor. Okay. Yes, Your Honor. But that's what you're relying, but that's not what the district court in this case relied on. He distinguishes Archuleta from Bradley. Well, he relied on Archuleta, which in turn relies on Bradley. No. It's a CF, but C, Bradley. I know, Your Honor, and that is a confusing citation. The parenthetical that follows that should actually be, I believe that's a parenthetical that describes Archuleta, not Bradley. And Bradley, I mean, Archuleta expressly relies on Bradley. So I agree he used CF, and I'm not sure why there. I would also note, though, that the district court found that, and explicitly noted that the circumstances did tend to moderate, but did not eliminate the government interest. So the court clearly was doing precisely what Sell requires, which is to look at the interests and the facts of the individual case and then see if there are special circumstances that affect that interest. And apparently, the court concluded that some things did affect that interest, but they only moderated it. They did not eliminate it. And, Your Honor, even if the court chose only to sentence Ms. Osborne to supervised release, that is still vital. That is still tremendously helpful to the safety of the community and really to Ms. Osborne as well, to have that extra layer of supervision there. So the government interest here is still present. It's still strong. Yes, it's moderated. I have to acknowledge that. But it is still there. I've got to look at your time now. You're over by a little more than two minutes. Thank you, Your Honor. I will submit and request affirmance. You're welcome. Did she have any extra time, the defense? Your Honor, I don't have any extra time. Well, put a minute and 30, please. You don't have to take it. No. I will never turn down time, Your Honor. Okay. That's sometimes what we're afraid of. I would like to point out that Bradley is a case that I am relying on. I think it's a misnomer for the government counsel to say that Bradley didn't mean what it said. It's a guideline case. Well, did Bradley rely upon statutory maximums? She said that if you read Bradley carefully, what the court was doing was actually focusing on statutory The defendant and Bradley got a 30-year sentence. So Bradley talked about expected sentence and imparity. So Bradley meant what it said. The argument that the government has an interest in supervised release makes no sense in this context. If Ms. Osborne got three years of supervised release, she would have already done her sentence in this case and done her supervised release time. So that bears no weight in this case either. With regard to Dr. Silvas, the government's contention that this court can look at the record as a whole and find that this court can piece the record together or that the district court could somehow piece the record together to build some findings, to build up Dr. Silvas' case for it is inappropriate. The government bore the burden below to build that case, to make the clear and convincing standard. It failed to do so. The court cannot somehow piece that record together. It's appropriate for this court to reverse the district court's decision below. The next step would be, and I'll proffer this to the court, for the defense to move to dismiss this case because this case has gone on long enough. Thank you. Thank you, counsel. Case is submitted.